Samuel Abrams and Frances R. Abrams v. Commissioner.
Abrams v. Commissioner
Docket No. 1063-63.
United States Tax Court
T.C. Memo 1964-256; 1964 Tax Ct. Memo LEXIS 82; 23 T.C.M. (CCH) 1546; T.C.M. (RIA) 64256; September 29, 1964
*82 1. Held, that a purported sale in 1958 by the principal petitioner for $100 of all of his stock in Bradley, Inc., to a close friend who managed a dress shop operated by said corporation, was not a bona fide arm's length transaction; and that petitioner is not entitled to a deduction for a long-term capital loss on said purported sale of $39,900 ($40,000 paid in for the stock, less $100 received on the sale). 2. Held, that cash advances by said petitioner to Bradley, Inc., from 1955 through 1960 in the aggregate amount of $37,500 were contributions of equity capital rather than loans; and held, further, that the capital investment represented by said advances did not become worthless in 1960, while the corporation's business was still being operated, so as to be deductible by petitioner in said year. 3. Held, that said petitioner has not established that he is entitled to greater deductions in 1958 and 1960 than those allowed by respondent, for expenses paid in entertaining individuals from whom the petitioner claimed to have received advice respecting his personal investments. 4. Held, that said petitioner is entitled to the full amount of a claimed deduction in 1960 for expenses *83 paid in moving the office where he carried on his extensive investment activities, to a new location. 5. Held, that said petitioner has not established the amount of deductible casualty loss sustained, in respect of a piece of household furniture that was totally demolished as a result of being dropped 16 stories, while it was being moved from one apartment to another. Norman Nadel, 1457 Broadway, New York, N. Y., for the petitioners. Stephen M. Miller, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The Commissioner determined deficiencies in the income taxes of the petitioners for the calendar years 1958 and 1960, in the amounts of $11,274.52 and $975.42, respectively. The issues for *85 decision are: (1) Whether the "sale" in 1958 by petitioner Samuel Abrams of all his stock in a wholly-owned corporation for $100, was an arm's length bona fide transaction which entitles him to deduct a "loss" thereon in the amount of $39,900. (2) Whether said petitioner in 1960 incurred a deductible nonbusiness bad debt loss of $37,500 on advances made by him to the above-mentioned corporation during 1955 through 1960. (3) Whether said petitioner is entitled to deductions in excess of the amounts allowed by the Commissioner for: Entertainment expenses in 1958 and 1960; office expense in 1960; and a casualty loss to furniture in 1960. Separate findings of fact and separate opinions are hereinafter set forth with respect to the above issues. All facts which have been stipulated are so found; and the stipulation of facts together with all exhibits identified therein, are incorporated herein by reference. Issues I and II Findings of Fact Petitioners Samuel and Frances R. Abrams are husband and wife residing in New York City. They filed a joint income tax return for each of the taxable years involved, with the district director of internal revenue in New York, New York. *86 The issues here involved concern only the husband whom we will hereinafter refer to as the "petitioner." Prior to 1950, petitioner was a textile manufacturer; and at all times thereafter including the taxable years here involved, he was engaged principally in handling his own personal investments in real estate and in common stocks listed on the New York Stock Exchange. He maintained a private office in New York City, where said activities were carried on and where his records were maintained. During the years here involved, his net worth was from 2 to 3 million dollars. Petitioner and his wife had for many years prior to 1952 been close personal friends of a woman named Flossie Schlussel. In the latter year she was employed as the buyer and manager of a retail women's apparel store in Stamford, Connecticut, which was owned by a sole proprietor and was commonly known as "Bradley's." During said year 1952, Flossie informed petitioner that the proprietor of said store desired to sell the same; and she suggested that petitioner buy it and she would operate it for him. Petitioner adopted this suggestion; organized a corporation under Connecticut law on January 7, 1952, under the name *87 of "Bradley, Inc."; caused this corporation to purchase the business of the existing proprietorship; and made arrangements with Flossie to manage it. He paid $40,000 into the corporation as its entire capital; and he received in exchange all the authorized, issued and outstanding capital stock, consisting of 100 shares of common stock. Petitioner was president and Flossie served as secretary and treasurer. Petitioner, his wife, and Flossie were the three directors. At the time the corporation was organized, the store premises were held under a lease from a realty corporation - which lease had a remaining term of approximately 4 years. Petitioner desired to have the term of the lease extended to 10 years; and the result was that a new lease was executed by Bradley, Inc., for a term of 10 years from February 1, 1952, at a minimum annual rental of $10,000. Under the terms of a guaranty agreement annexed to the lease, petitioner agreed; (1) That he would guarantee to the lessor, the tenant's performance of all terms of the lease, including payment of minimum rentals of $10,000 per annum; and (2) that he would from time to time advance and furnish to Bradley, Inc., in addition to the *88 amount paid in for capital stock, funds sufficient to provide it with working capital. Petitioner further covenanted in said guaranty agreement, that he would not at any time, during the term of the lease, sell or transfer more than 49 percent of the capital stock of Bradley, Inc., without the written consent of the lessor, "so that throughout the whole term of said lease [he] the Guarantor shall maintain the controlling ownership of the capital stock of the Tenant and shall always be in full control and management of its business in the store premises." The operation of the store by Bradley, Inc. did not prove financially successful. This was due in principal part to large stores being opened in surrounding areas and to the gradual decline in the character of the area in which the Bradley store was located. In all years from 1952 (the date of incorporation) through 1961 (the date of dissolution), operating losses were sustained by the corporation, as follows: Year
Loss
Year
Loss
1952
$ 2,959.07
1957
$12,880.25
1953
1,094.55
1958
8,264.32
1954
7,862.40
1959
7,108.20
1955
12,127.33
1960
11,598.52
1956
6,428.58
1961
17,340.03
Petitioner *89 received a salary from the corporation for each of the years 1952 through 1957 in the amount of $7,800 per year; in January 1958, he received a salary of $400; and he received no salary thereafter. The only services which he performed for the corporation was to guarantee the payment of rent on the premises, to make various advances of operating funds as hereinafter shown, and from time to time to guarantee repayment of bank loans made by the corporation. Beginning in August 1955, and in all years thereafter until the corporation was dissolved in 1961, petitioner made cash advances to Bradley, Inc., as follows: Date
Amount advanced
Aug. 8, 1955
$10,000.00
Nov. 14, 1956
4,000.00
Nov. 6, 1957
2,500.00
Nov. 18, 1957
1,500.00
Jan. 23, 1958
5,000.00
Oct. 30, 1958
2,500.00
Jan. 30, 1959
2,000.00
Mar. 16, 1959
2,000.00
Jan. 28, 1960
2,000.00
Mar. 30, 1960
3,000.00
Oct. 28, 1960
3,000.00
Jan. 31, 1961
2,000.00
Mar. 31, 1961
3,000.00
Oct. 14, 1961
2,500.00
Dec. 20, 1961
3,333.22
Total
$48,333.22 All of these advances were paid directly into the corporation; and although portions of them were used to pay the rent on the leased premises, none *90 of them was paid directly to or on demand of the lessor. These advances were carried on the books of Bradley in an account captioned "Notes Payable - Samuel Abrams"; but none of the advances made prior to the year 1959 was evidenced by any written instrument, none was secured, and none bore any interest. As to advances made in 1959 through 1961, each of these was evidenced by a non-interest-bearing demand promissory note from Bradley, Inc. In the case of all advances made from 1955 through 1961, it was understood both by petitioner and by Flossie that the sums would not be repaid, except out of anticipated earnings and profits of the corporation; and their repayment was subordinated to payment of the general creditors of Bradley, Inc. Petitioner during the year 1958 and prior to December 29 thereof, derived long-term capital gains of $127,764.37 from the sale of securities held as personal investments (other than the stock of Bradley); and during this same period he incurred offsetting capital losses of only $497.96. On or about said date of December 29, 1958, petitioner told Flossie that he would like to sell to her all of the stock of Bradley for $100. If this were done he expected *91 that it would reflect a capital loss of $39,900 on his original stock investment of $40,000. Flossie was reluctant to enter into such transaction, but she felt obligated to accommodate petitioner. Accordingly under the last-mentioned date, petitioner and Flossie entered into a written agreement which provided in substance and in material part: 1. Petitioner agreed to sell to Flossie all of his shares of stock (being all the issued and outstanding stock) of Bradley, Inc., for the sum of $100, and under which he also agreed to resign as an officer and director of the corporation. 2. Flossie agreed to indemnify and hold petitioner harmless "against any liabilities of the corporation of any nature" which he might be called upon to meet because of his former status as officer, director, and shareholder of the corporation. 3. Flossie further agreed that she would cause the corporation to "resecure" the advances which petitioner had theretofore made to the corporation (totaling $25,500) by causing the corporation to issue to him a promissory note and a chattel mortgage upon all the furniture and fixtures of the corporation. Both parties knew at the time of this agreement, that Flossie *92 had no funds which she could use in carrying out her indemnification agreement; and the corporation's furniture and fixtures had a total book value of only $8,075.02. On the date the above instrument was executed, Flossie paid to petitioner the above-mentioned amount of $100; and on the same date the above-mentioned chattel mortgage was executed and signed by Flossie as "president." Petitioner's stock was not transferred of record on the books of the corporation; and the evidence does not establish whether or not his certificate was endorsed by him. At the time of the trial herein, neither the stock transfer book nor the minute book of the corporation could be found. When the corporation was organized in 1952, Flossie placed these books in a file in the basement of the store; and at no time thereafter did she ever look at them. No person other than Flossie had access to them. The balance sheet of the corporation as of December 31, 1958, 2 days after the foregoing transaction, showed that the corporation had cash of $2,000, inventories of approximately $12,000, total assets of almost $22,500, and liabilities to outsiders of approximately $8,850. Following the foregoing transactions, *93 petitioner continued to make advances to the corporation, as above found as a fact. Neither Flossie nor the corporation had funds which would have permitted the business to continue its operations in the absence of such advances. The balance sheets of the corporation showed that at the end of the year 1955 when the first advances were made, the corporation had an accumulated deficit in earnings and profits of $24,298.35; and that such deficit increased in each subsequent year, until at the end of the year 1961 it totaled $87,918.25. It was hoped, however, that such loss trend might be reversed; and for the year ending in 1961, the operating statement of the business reflected that merchandise was purchased for sale to customers in the amount of approximately $13,000. Bradley, Inc. was dissolved pursuant to the laws of the State of Connecticut on December 29, 1961. The balance sheet of the corporation immediately prior to said dissolution, shows that all trade creditors of the corporation had then been paid in full; and it has been stipulated that "a final liquidation distribution" was paid to petitioner on December 28, 1961, in the amount of $410.57. Petitioner, in the joint income *94 tax return filed by him and his wife for the year 1958, claimed a long-term capital loss of $39,900 in respect of the purported "sale" of his stock in Bradley, Inc. in said year. The Commissioner, in his notice of deficiency herein, disallowed all of said claimed loss on the ground that such purported "sale" was not bona fide. As regards the advances which petitioner made to Bradley, Inc. beginning in 1955, he first claimed in his 1959 income tax return a bad debt deduction for all advances which he had made to Bradley, Inc. in and prior to said year in the aggregate amount of $29,500. The Commissioner disallowed such claimed deduction; and a petition was filed in this Court in a case which preceded the instant case (Docket No. 2398-62). Thereafter a settlement stipulation was filed in said prior case, in which said claimed bad debt deduction was abandoned. Subsequently in petitioner's 1960 income tax return, he claimed a business bad debt of $8,000 in respect of the three advances which he had made to Bradley, Inc. during 1960. The Commissioner, in his notice of deficiency herein, disallowed this claimed deduction on the ground that the advances did not represent debts and did *95 not become worthless in that year; and he also determined in the alternative, that if the advances were held to be debts which became worthless in 1960, then they constituted nonbusiness debts. Thereafter, at the trial in the present case, petitioner amended his pleadings to claim that all advances made by him to the corporation from 1955 through 1960 in the aggregate amount of $37,500, should be allowed as a nonbusiness bad debt deduction in 1960. Ultimate Findings of Fact The purported "sale" by petitioner of all his shares of stock in Bradley, Inc. for $100 was not an arm's length bona fide transaction; it did not effect a disposal of said stock in 1958; and it did not give rise to a loss in that year. The cash advances made by petitioner to Bradley, Inc. from 1955 through 1960 in the aggregate amount of $37,500, constituted additional investments of equity capital, and not loans; and he sustained no loss with respect thereto in 1960. Opinion 1. Stock "Sale" Transaction of 1958. - With regard to petitioner's claimed loss on the purported "sale" of stock in 1958, the basic issue is whether such purported sale by petitioner to Flossie Schlussel was an arm's length bona *96 fide transaction which effected a termination at that time of his stock ownership in the corporation. The Commissioner, in his notice of deficiency, has determined that the "sale" was not a bona fide transaction; and petitioner had the burden of establishing error in this determination. We think that he did not sustain that burden. The situation here presented was this. Prior to December 29, 1958, petitioner had realized large amounts of capital gains in 1958, and had only a small amount of offsetting capital losses; so that it would have been advantageous to him taxwise if he could realize a loss in respect of his disappointing investment in Bradley, Inc. without waiting until dissolution of the corporation, which could not be accomplished for several years because of the guarantee which he had given to the lessor of the corporation's premises. In this situation, he proposed to Flossie, who was a close personal friend that was managing the store on his behalf, that she buy all his stock on which he had a $40,000 cost basis, for a nominal price of $100. The fact that Flossie was reluctant to enter into such transaction, is shown by the following excerpts from her testimony: Q. *97 How extensive were your negotiations [for the purchase of the stock]? A. Well, I just had to take the store and do the best I could. Q. What do you mean by you had to take the store? A. I felt a moral obligation. * * *
Q. How did you arrive at the $100? A. I didn't - I just didn't want to pay anything at all. The evidence is unsatisfactory as to whether petitioner's stock certificate was either endorsed or delivered, and as to whether any new certificate was ever issued to Flossie. Petitioner merely testified that "I agreed to accept $100 for the store" (meaning his shares of stock); but he made no statement as to his endorsement or delivery of the certificate, or as to the transfer of the stock of record. Flossie's testimony, on the other hand, is confused and [*] [*] [*] [*] in response to leading questions that she received the stock certificate and that a new certificate had been issued to her, she then conceded on cross-examination that both the stock record book (from which the new certificate would have had to be issued) and also the minute book of the corporation had been placed in a basement file at the store when the corporation was organized in *98 1952 and had not thereafter been either withdrawn or used. She further testified that no one other than herself had access to these records; that she had not issued any new stock certificate to herself; and that she had not made any entries in the minute book. Also, neither the stock certificate book nor the minute book could be located at the time of the trial; and no other person testified that any writings had been made in either of them. On the state of this testimony, we are convinced that Flossie did not know what steps, if any, had been taken to effect a legal transfer of petitioner's stock. The evidence is actually insufficient to establish, either that petitioner's certificate was endorsed and delivered, or that any transfer of the stock was made on the books of the corporation. After the alleged "sale" of the stock and continuing until the corporation's dissolution in 1961, the business relationship between petitioner and Flossie continued to be substantially the same as it was prior to the alleged sale. Flossie still operated the store; and petitioner still continued to make up whatever deficits resulted from losses in operations and from payment of rent on the property. *99 It seems extraordinary that any astute businessman like the petitioner would have gone along with any arrangement under which an uncontrolled person would handle the store operations which might create the deficits that he would have to make up. Furthermore, as the parties have stipulated, when the corporation was dissolved in 1961 petitioner was paid a "final liquidation distribution," which tends to indicate the existence of an equity interest. It is noteworthy also that (as shown in our Findings of Fact) 2 days after the purported sale, the corporation had cash of $2,000, inventories of almost $12,000, and total assets of nearly $22,500; whereas the amount of its total obligations to persons other than petitioner was only about $8,850. Here again we believe that an astute businessman like the petitioner would not in such situation have made an arm's length sale of all his stock for only $100, when the corporation's current assets were more than $5,500 in excess of its current (and only) liabilities to outsiders. It is clear to us, after examining this entire transaction and weighing all the evidence, that the purported "sale" of stock by petitioner was merely a formalistic device *100 by which he hoped to create a tax deductible loss, without effecting any substantial change in his relation to the business. We hold that petitioner has failed to establish error in the Commissioner's determination that the transaction was not bona fide; and we further hold that his claimed loss of $39,900 in such transaction is not allowable. 2. Claimed Loss on Cash Advances. - Petitioner emerges, from a reading of the record herein, as the financial "angel" of Bradley, Inc. He not only furnished the entire $40,000 initial invested capital of the corporation, but also he was the sole source of substantial amounts of working capital required to keep the corporation in operation, as it continued to sustain operating losses and accumulate ever-growing deficits. Flossie had no funds to invest; and the corporation itself was unable to generate sufficient funds to pay its rentals and defray its other operating expenses. In this second issue, we are concerned with the tax consequences of petitioner's cash advances, aggregating $37,500 during the period 1955 through 1960. Petitioner claims that these advances gave rise to a debtor-creditor relationship between him and Bradley, Inc.; and *101 that such $37,500 "debt" became worthless in 1960 while the corporation was still carrying on its operations, and was deductible by him in that year. Petitioner concedes that if a "debt" was created, it was a nonbusiness debt, rather than a business bad debt as he had originally claimed on his 1959 and 1960 returns. Respondent, on the other hand, determined and here contends that no "debt" was created, for the reason that the cash advances constituted contributions of equity capital rather than loans; and that even if a "debt" was created, it did not become worthless in 1960. Our ultimate finding of fact shows that we agree with the respondent's position. We shall consider first the character of the advances - as to whether they were loans or contributions of equity capital. This is primarily a question of fact, to be resolved from a consideration of all the facts and surrounding circumstances. Emanuel N. (Manny) Kolkey, 27 T.C. 37, 57-59, affd. (C.A. 7) 254 F. 2d 51. Two good indicators as to whether a stockholder's advances to a close corporation are genuine loans, are: (1) Whether an outside lender would in the particular circumstances have made a loan *102 of such funds to the corporation; for this tends to show whether the corporation had credit standing that would have enabled it to borrow the funds in an arm's length transaction; and (2) whether the funds were placed at the risk of the business, for as was said by the Court of Appeals for the Sixth Circuit in United States v. Title Guaranty & Trust Co., 133 F. 2d 990, 993: The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit. The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them. * * * The manner in which the parties recorded the transaction on their books, and the instruments they used in carrying out the transaction, are of course to be considered; but these factors are not controlling. Doyle v. Mitchell Brothers Co., 247 F. 2d 179. In the instant case, we believe that an outsider would not have made loans to Bradley, Inc. in the relatively large aggregate amount *103 advanced by petitioner; for, although the corporation's situation during the years 1955 through 1960 was by no means hopeless, it did not, to say the least, present a roseate picture. The corporation had sustained losses in every year since it was formed; its neighborhood location was deteriorating; it was faced with heavy competition; and it had a burdensome lease. Moreover, the advances were made under an arrangement that any right to repayment would be subordinated to claims of general creditors, and that in no event would repayment be made except out of anticipated earnings and profits, for which the prospects were not bright. Regarding the advances made during 1958 and preceding years, these were not initially evidenced by any note fixing a [*] time [*] repayment, were not secured, and were not interest bearing. And although beginning in 1959, these advances were "resecured" by a corporate note and chattel mortgage, all parties recognized that such "resecuring" was meaningless because Bradley, Inc. did not have funds with which to meet the same. As regards the later advances made in 1959 and 1960 which were evidenced by notes, these were in substantially the same situation. *104 Petitioner never made any demand for repayment of any of the advances, and he did not expect that any demand would be made. We hold that petitioner's cash advances to Bradley, Inc. constituted contributions of equity capital, and not loans. We turn next to a consideration of whether the capital investment represented by said cash advances made during the years 1955 through 1960 in the aggregate amount of $37,500, became worthless in the latter year so as to permit petitioner to deduct a loss with respect to them for the year 1960. As to this, it is well settled that a mere decrease in the value of a stockholder's investment will not suffice; for there must be some identifiable event, in the year of the claimed loss, which will mark the end of the investment and permit the deduction of any loss then realized. Income Tax Regs., sec. 1.165-1(d)(1). In the instant case, no such identifiable event occurred in 1960. The corporation not only continued its business operations into 1961; but it even purchased in that year approximately $12,000 worth of new merchandise inventory for resale, and made sales of nearly $28,000. It was not dissolved until the end of *105 the following year; and prior to such dissolution, all of its trade creditors were paid 100 cents on the dollar. In our judgment, the identifiable event which marked "the end of the road" so to speak for petitioner's investment, did not occur until Bradley, Inc. was finally dissolved - and that did not occur until December 29, 1961. We sustain the respondent on this second issue. Issue III Findings of Fact and Opinion 1. Deductions for "Entertainment" Expenses in 1958 and 1960. - As we have heretofore found as a fact, petitioner during the taxable years here involved, was principally engaged in handling his investments in listed common stocks and in real estate properties. For this purpose he maintained an office in New York City where he carried on his activities and kept his records and books of account. From time to time during each of the years involved, petitioner would take various individuals to lunch, or to the theater, or to the country club where he was a member to play golf. During the course of these occasions, petitioner would discuss with his guests, investments that he was contemplating making and would ask their opinions as to the advisability thereof. *106 Petitioner claimed deductions for "entertainment" expenses in the total amounts of $2,766.74 and $2,706.18 in his returns for 1958 and 1960, respectively, of which amounts respondent allowed $883.37 and $878.09, respectively. He disallowed the remainder of such claimed expense deductions on the grounds that they did not constitute ordinary and necessary expenses and that they were not substantiated. Petitioner claims that the amounts of the foregoing expenses are deductible under section 212(1) and (2) of the 1954 Code, as expenses for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. Petitioner claims that, though labeled "entertainment" expenses, the disputed amounts represent investment counsel fees, of the type permitted deduction in Edward Mallinckrodt, Jr., 2 T.C. 1128, 1146-1148, and Elma M. Williams, 3 T.C. 200, and by Income Tax Regs., sec. 1.212-1(g). Respondent argues in support of his determination, that the disallowed amounts are not deductible because they were related to the making of new investments, rather than to investments *107 already made. It goes without saying that petitioner had the burden of establishing that he is entitled to greater deductions than those already allowed him by the respondent. We think that the respondent's legal argument goes too far. In Mallinckrodt, supra, we made the following finding of fact: In managing and endeavoring to conserve his investments, the petitioner from time to time consulted the firm of Loomis-Sayles & Co., of Boston, Massachusetts, and obtained from them advice as to what investments under the then existing conditions ought to be disposed of, what ought to be purchased in their stead, and what investments might be safely and profitably retained. * * * We held those expenditures to be deductible under section 23(a)(2) of the 1939 Code, the predecessor of section 212 of the 1954 Code. See also Elma M. Williams, supra, where fees paid to the same Loomis-Sayles & Co. were held to be deductible under section 23(a)(2). It seems to us that the Mallinckrodt case is authority for the proposition that investment counsel fees paid for advice as to investments to be made, are deductible. We believe it much too narrow a construction to say, *108 as the respondent appears to do, that investment counsel fees are confined to dispositions of property. However, on the facts of the record, we believe that petitioner has not introduced sufficient probative evidence to establish that he is entitled to greater deductions than those already allowed to him by respondent. Assuming that petitioner did obtain some investment advice from his guests at the luncheons and on the golf course, there was, we think, a distinct flavor of personal entertainment in such occasions, and the evidence is not such as to permit us to separate the personal element (which is nondeductible under section 265 of the 1954 Code) from the other elements. Nor does the record contain a sufficient tie-in between the persons entertained, the advice sought and received and the action taken by petitioner as a result. Petitioner's testimony was extremely vague and general. It was totally lacking in that specificity and concreteness that would lead us to hold that the respondent has erred. We hold that petitioner has not established that he is entitled to any greater amounts than those allowed him by the respondent. 2. Deduction for Expenses of Moving Office in 1960. *109 - During 1960, petitioner moved his above-mentioned office where he carried on his investment activities from one location in New York City to another location in the same city. The mover was unwilling to take petitioner's check in payment; and it was necessary that petitioner pay the mover in cash. Petitioner also gave cash gratuities to the mover's helpers and to persons working in the building from which he moved and those in the building to which he moved - such as elevator operators and doormen - for their help and services in completing the move. Petitioner deducted $1,820.63 in his 1960 return as "office expenses." The respondent disallowed $1,250 of said amount (the portion claimed to represent expenses of moving the office), on the grounds that they did not constitute ordinary and necessary expenses and that they had not been substantiated. Income Tax Regs., sec. 1.212-(1)(g) permit a deduction for office rent and clerical help paid or incurred by a taxpayer in connection with investments held by him. We think that the expenses of moving an investment office are fairly within the ambit of this regulation. (Compare Electric Tachometer Corporation, 37 T.C. 158, 161, *110 wherein we held that expenses of moving machinery and equipment of a business constituted ordinary and necessary business expenses.) Indeed, the respondent on brief confines his argument to alleged lack of substantiation for the moving expenses here involved. It is true that petitioner produced no documentary evidence in support of these moving expenses. But after observing him testify and after listening carefully to and weighing his testimony and considering the locale of the move, we are satisfied that he expended $1,250 in moving his office. We hold that the expenses of moving petitioner's office are deductible in full; and we sustain the petitioner on this issue. 3. Deduction for Casualty Loss in 1960. - In 1960, petitioner moved his personal residence from one apartment to another. Petitioner had a large piece of furniture - a breakfront - which would not fit into the new apartment's elevator; and it was necessary for the movers to hoist it up the side of the building, using ropes and pulleys, to bring it into the apartment through a window. While the breakfront was being raised, the ropes broke; and the breakfront fell 16 stories to the sidewalk below and was completely *111 demolished. Petitioner had no insurance on the breakfront; but he was reimbursed for the breakfront by the mover, in an amount not shown by the record. Petitioner had acquired the breakfront 5 or 6 years earlier, at a cost not shown by the record. Petitioner paid $1,822.33 for a new reproduction of the breakfront which had been destroyed. On his 1960 return, petitioner deducted $1,503.40 as "casualty losses not covered by insurance - storm damage." Respondent allowed $541 of the claimed deduction; and disallowed the balance of $962.40. He explained the disallowance as follows: (d) It is held that $962.40 of the deduction of $1,503.40 claimed on your return for the year 1960 as a casualty loss representing the cost in excess of insurance for repairing a piece of furniture which fell to the ground while being hoisted up the side of a building is not an allowable deduction under the provisions of section 165(c)(3) of the Internal Revenue Code of 1954. The deduction is disallowed for the additional reason that you failed to substantiate the amount of loss claimed. It would appear, from the foregoing paragraph of the deficiency notice, that the $541 of *112 casualty loss which respondent allowed, pertained to the "storm damage" mentioned on petitioner's return; and that the disallowed portion concerns only the casualty loss claimed for the breakfront that was demolished. Section 165(a) grants a deduction to individual taxpayers for property losses due to fire, storm, shipwreck, or other casualty, and not compensated for by insurance or otherwise. We have no doubt that the destruction of the breakfront in the circumstances above described is within the statutory phrase "other casualty." The issue is thus narrowed to the quantum of the loss deduction to which petitioner has proved himself to be entitled. The regulations (Income Tax Regs., sec. 1.165-7(b)(1) state the well-established rule respecting the amount of deduction for a casualty loss - (b) Amount deductible - (1) General rule. In the case of any casualty loss * * * the amount of loss to be taken into account for purposes of section 165(a) shall be the lesser of either - (i) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; *113 or (ii) The amount of the adjusted basis prescribed in § 1.1011-1 for determining the loss from the sale or other disposition of the property involved. Of course, the lesser of the two foregoing amounts must still be reduced further by the amount recovered by the taxpayer by insurance or otherwise, in order to determine the amount of the deductible casualty loss. See Income Tax Regs., sec. 1.165-7(b)(3), Example (1). The record in the instant case is woefully weak in establishing the necessary elements for deduction of a casualty loss in respect of the breakfront. The evidence does not establish either: (1) The fair market value of the breakfront immediately preceding the casualty; (2) the adjusted basis of the breakfront at the time of the casualty; or (3) the amount of reimbursement that petitioner recovered from the mover. We can infer that the fair market value of the breakfront immediately after the casualty was zero. In these circumstances, we are impelled to hold that petitioner has not borne his burden of proof to establish elements (1), (2) and (3) above which are necessary in fixing the amount of his casualty loss that would be deductible. *114 We sustain the respondent on this issue. Decision will be entered under Rule 50.